May it please the court, I would like to reserve at least five minutes for rebuttal. I'm here to ask that this court hold the company that rented property in the port of Los Angeles for the purpose of carrying out a boat repair business and that promised the city that it would keep that property in a clean and wholesome and sanitary condition be held responsible for the pollution that was caused by that boat repair operation. Well, it's a little bit more complicated than that, isn't it? At the highest level, this is what this is about. We know that boat repair and boat building was a dirty business. It involves hydraulic oil. It involves lubricating oil. It's got all manner of solvents. You're removing paint. You're applying paint. These aren't ordinary paints. Back in those days, the paints had PCVs in them. Anti-corrosive paints were loaded with zinc. Antifouling paint was full of copper. That's the talk. You're not saying that PAI dumped any of those horrible things which you are now discussing in an attempt to perhaps get me away from some of the issues in this case. PAI was not an active participant. There's no doubt. They were either an owner or a loan owner under CERCLA. Correct. Right? And can we agree that they're certainly not an operator? Correct. So the question is, is a corporation in California which procures a permit, this particular permit which looks to me a lot like a lease, right, is that person an owner under CERCLA for purposes of potentially responsible party liability under CERCLA? That's the issue. That's the first issue. Let's go to that. You know, and it doesn't serve the goals of CERCLA. It doesn't comport with the case law. Let's pull back a little bit from whether it serves the goal of CERCLA or the intent of the legislators or consistent with its legislative history. Let's talk about what the statute reads. It says owner. Now, as I recall last term, the Supreme Court dealt with two cases, Burlington Northern and Shell, which I had some acquaintance with. And as I remember in the apportionment area, the Supreme Court said that it would determine language or interpretation of language in CERCLA to mean the common law meaning of language. Now, if PAI wasn't an owner, didn't have fee title, isn't that the end of the issue? No. And this Ninth Circuit has said before in the Long Beach Unified case that we're going to rely on common law definition of ownership. And that would include leases under some circumstances. Under what circumstances? Well, you know, sufficient interest. And I'm going to go back to the policy reasons in the case law here and say right out of the box that this is not the Commander Oil case. You remember that the court in that case was concerned about surprising an innocent tenant with new and unexpected liabilities. PAI in this case is not an innocent lessee that's going to be surprised by the imposition of new and unexpected CERCLA liabilities. In fact, they expressly contracted for those liabilities. They agreed in the contract to keep that property clean, prevent hazmat from existing. CERCLA didn't even exist when PAI took over. Actually, that's my point. I mean, they did by contract agree to keep the property free of hazardous, dangerous materials. That's the same thing. It's the same liability. It's a liability that was assumed by this tenant. I mean, they argue that the contract didn't give them sufficient interest in the property. But common sense should tell you that you don't run a ship repair business on land you don't control or on property that you have to share with others. This business includes a ship lift. It's got boat cradles on railroad tracks. It's got a turntable that allows you to slide those cradles around the yard. It's got a machine shop, a wood shop, a storeroom, offices, a retail store. They're sandblasting. They're spray painting. They're building and repairing boats. Common sense should tell you that if you rent property for that kind of a business, you're going to have it fenced and you're going to keep the key to the gate. Counsel, Judge Gould, just to clarify on that argument, my understanding was they didn't run, that PII didn't run the boat works, that they had a subsidiary, San Pedro Boat Works, and that it was the one, you know, doing the repair and the painting or whatever. So given that circumstance, if they had a wholly owned subsidiary that did that and they didn't do that, and if the subsidiary was sold by them before Coca-Cola acquired them, then why is PII still an owner of the property on your theory? Is it just from the permit? Just, yes, they held the paper. They held the contract. They're the party on the contract. They have the obligation. They held the permit for nine months before they assigned it to San Pedro Boat Works. Yes. But they did not exercise any supervisory role in those nine months, did they? Because that was all done by San Pedro Boat Works. Well, this is not a best foods analysis about active participation. The question is do they have sufficient interest in the property to call them, in essence, a common law owner. And they agreed to pay the possessory property tax on it. What was the reason why they didn't transfer the permit? I can't remember exact numbers, but you know there was a 900 number and there was a 1,000 number. Why wasn't the permit transferred from PAI to San Pedro Boat Works at the same time that PAI transferred the operations to San Pedro Boat Works? Yes, we don't know the answer to that, Your Honor. I will point out that in the record, was there any indication that it was the city of Los Angeles bureaucracy holding up the term we use these days, processing, the processing of the permit that made it there to be an interim period of time when PAI had the permit and San Pedro Boat Works did not? There's no indication that that was the case. So there was no reason for... Okay. Did PAI have the permit throughout even after San Pedro was doing the operations? PAI held the permit in its own name from August of 69 until May of 1970 and then a new permit was issued again in the name of PAI, that was permit 1076, which they held for just another month before assigning it to their subsidiary, San Pedro Boat Works. And I'll point out that when PAI took the assignment from the previous tenant, LA Harbor Marine, there was an express release. And this Court may be familiar with the concept that when you assign a lease, you're not released from the contractual obligation unless the landlord gives you an express release. So in this case, I would argue that PAI remains contractually bound under those permit 1076, even after the assignment. And, in fact, that permit 1076 was in place until 1982. So do we have any Ninth Circuit precedent or is there any precedent in any other Circuit Court of Appeals that addresses whether a transient status as a licensee or permittee renders someone an owner within the meaning of CERCLA? Well, that's the Commander Oil case that they diminished the nature of the property interest, even though it was a lease. In the Long Beach Unified case, they said, we're not going to impose CERCLA liability on a holder of an easement. But even this Court noted that the result would have been different had the pipelines lying in those easements caused the contamination. In all of these cases, the holdings are conditioned on circumstances of the case. I mentioned the Commander Oil where Barlow had a lease, but he's only allowed to operate on Parcel 7A, I think, not Parcel 7B. Parcel 7A didn't have storage tanks on it. He didn't participate in the business that caused the contamination. In this case, PAI is actually given a permit, a lease, whatever you choose to call it, to do this very business, to hold this very property and care for this property while that business is being conducted on it. That's the South Carolina recycling case. Those are the circumstances, and that's the circumstances here where it makes total sense to hold the contracting party, again, the lessee, the permittee responsible. You said you wanted five minutes for rebuttal? I did. You're below five minutes now. Let me just hit my nuisance arena. This whole discussion about diminishing the character of the contract carries over into the nuisance arena, and I think the district court made two mistakes there. A, the court used its CERCLA ownership analysis to say that there was no possession for purposes of a nuisance liability, but under nuisance theory, they just talk about a possessor, and possessor includes a person who's entitled to immediate occupation. Doesn't a possessor also have to have knowledge as a nuisance? Well, and that's the second point, is that the court used a constructive knowledge standard, but in the restatement, it says it's not knows or has reason to know, but it's knows or should know. Right? Should know includes having a reason to discover. Did PAI have a reason to discover? Absolutely. They signed a contract that said I'll keep the property in clean and wholesome condition. I'll prevent any hazardous material from accumulating on it. They had a contractual duty to discover that contamination was occurring there. Counsel, if I could just pose a question to you, and you can address it when you reply if you want. What bothers me in this kind of case is that CERCLA has such a draconian application to a potentially responsible to an owner that, like, I wonder if there's precedent that would say we can't lightly characterize someone as an owner in a disputed case. I wonder if there's any precedent along those lines. If there are not, if there isn't, then it's probably not a very useful idea. But it just seems to me that I'd like to know if there is anything on that. Thanks. The cases I mentioned, they do. They do discuss that and they do discuss the burden of a strict liability case. But they again, they go back to the circumstances, the individual circumstances of the case. And is this an innocent tenant or is this a party that undertook a limited interest or an interest in property for the very purpose that then the very business that then caused the contamination? Yeah. Good morning, Your Honors. William Sullivan of the Paul Hastings firm with me. Scott Carlton, who's been on the brace with me. And may it please the court. When P.A.I. acquired the San Pedro Boatworks and the business was known as the San Pedro Boatworks at the time, San Pedro Boatworks was there doing the ship maintenance work. There is no mystery about that. So when we stop and pause at the moment of the acquisition of the subsidiary and look at what's going on, we have an owner, the city, and we have an operator, San Pedro Boatworks, fully engaged, everyone knowing what's going on. We also have the subsidiary relationship created here, which Best Food tells us we have to respect. And that's not just a circular ruling. That's pretty much a doctrine that really does transcend all of the law. And I think in Best Foods, Justice Souter laid that out fairly well, quoting all the way back to Justice Douglas, well back into the 1930s. But the issue here isn't whether or not P.A.I. was an operator. We know it wasn't. The question is, if its subsidiary was doing some actions, can it be blamed for it? The city offers the idea that we somehow have a lease, and trying to bootstrap a lease following the South Carolina case into treating it as ownership. We have an owner here, the city. They knew everything that an owner knew about this property. What was granted was a permit. We think it's a license. But I think what Commander Oil teaches us is not that you classify it necessarily, but you look at what's really going on. And what Commander Oil says is, are you a de facto owner? Say that again. Commander Oil says, are you a de facto owner? That's really the question. It's not, are you a lessee or are you an easement holder? It's, have you become the owner of the property? Has your interest transcended that of the actual fee title owner? Commander Oil tells us, and I think it's great because it says, look, don't look at this site control concept that had been offered before, as to who controlled the site, because that can mean misguiding. And, in fact, Commander Oil rejects the principal case relied on by the city, the South Carolina case, and it said it focused too much on that. What Commander Oil tells us is, look, the crucial question is whether the lessee's status is that of a de facto owner. And it gives us five guidelines to look at, not exclusive, as it says, but things to look at. It was an extensive term, and the example used by the court there was, is it a 99-year lease? And we're familiar with that concept in the law, and we often hear about long-term leases like that. Were there rights in the owners is another issue. Can it be terminated? Can the lease be terminated before expiration? That was an issue that looked at. If there's no ability to terminate, then you begin to look like an owner. If you apply the Commander Oil test, the facts here to this permit, you see that we don't have a lease, and we don't have anything that meets the Commander Oil test. By the way, you're saying when you apply Commander Oil, I think the facts here are undisputed as to the terms of the permit and the lease, so what you're asking us is to do a de novo review of, well, you're the appellee, but what they're asking us is to do a de novo review, and you don't object to that as a standard review. That's the standard, Your Honor, as we understand it, yes. Another point I think here that's really important to the methodology that's employed by the city, which is to try to pigeonhole this into a lease, is to take a look at their own rules at the time. The charter wouldn't have allowed a lease at this point. And the interesting thing is when you look at the charter provisions, they tell you that the folks running the harbor can grant a permit if it is consistent with the promotion and accommodation of commerce and navigation and fisheries. In order to give a lease, which is what they want this to become so desperately, they have to make an absolutely reverse finding. They have to make a contrary determination. It has to be by the Harbor Commission. It has to be by order, and they have to find that the land to be leased was not needed for the promotion and accommodation of commerce, navigation, and fisheries. So I think that by itself disposes of the lease question and the analogy that runs there. The critical issue here, I think, is to look at what happened to PAI. PAI had a subsidiary that it acquired. That same business that it bought was doing the boatyard work before, long before PIA ever thought of acquiring them. In classic fashion of a holding company, they acquired a subsidiary and did not operate it. The fact that it owned the subsidiary gives no more rights or obligations than that subsidiary has. We know that the corporate form is well regarded. So at the end of the day, we would recommend to this Court that Commander Royal really has a sound analysis about what it is that would make someone an owner or not an owner. And looking at this permit here, it falls far short of those issues, particularly in terms of the use, the limitations on the use, and the term and the relocability of the term. Those are issues. Help me because this is a complicated situation. PAI had a wholly owned subsidiary, San Pedro Boatworks. Correct. Then PAI was bought by BCI, Coca-Cola, but by that time it had sold San Pedro Boatworks? It's even more attenuated than that, Your Honor, but basically in 1969 the acquisition of the subsidiary was conducted. That's when PAI bought the sub San Pedro Boatworks. In 74 it sold it, and then through a series of several more iterations, ultimately PAI was sold to a bottling company. There's some Dr. Pepper bottling and others in the middle. So there was a period from 69 to 74 when PAI owned San Pedro Boatworks as a wholly owned subsidiary. And you agree with the chronology given by counsel that it was in 1970 that the permit was assigned from PAI to San Pedro Boatworks? That is correct. It's not disputed. And that was an assignment by PAI, which was consented to by the city of Los Angeles? Yes. I can tell an old San Franciscan who gets the city and county. Whenever I say city, I always think city and county. So I think that's the essence of it, and I think Commander Royal gets it. Let me turn briefly to the nuisance point, because I think it really does leverage off of this issue. There are two things about the nuisance point that I think are worth making here. One is that the very language of the restatement says possessor. It's not ambiguous about what that means. The section that counsel cites, too, is the restatement 838. And when you read the comments about that, it tells us to go to section 328 to find out what a possessor means. And a possessor means someone who occupies the land, someone who has the right to occupy the land. And, in fact, 838, just to come back to that for a moment, indicates that this is when someone is in possession of the land and there's another third party who's coming on it. That doesn't fit at all. The paradigm is just, frankly, wrong for the nuisance analysis here. The issue is possessor, and at no time did PAI possess. At every point during this, San Pedro Boatworks, which, by the way, was the DBA of the entity before the acquisition by PAI, was in possession of the land, always in possession of the land under the restatement. And I think that fundamentally ends it. The other thing that creeps into the analysis that we see from the city here is also the corporate forum, the best foods concept, arguing that somehow there's a duty with a subsidiary. Somehow if you own the subsidiary, you're obligated. I think that the protection of the corporate forum here indicates that that should not happen. More importantly, this was looked at below, and the district court found nothing about the grounds for piercing the corporate veil. Again, a de novo analysis for this court, but we think compelling arguments exist on the nuisance matter by itself. I think that argument, frankly, falls flat. If your honors would like me to address the leave to amend issue, I can. I think it's very simple. It is an abuse of discretion standard here, and the trial court went through this issue fairly well. This was a trial court managing some complicated litigation. Coca-Cola and the city knew that they wanted to move towards a summary judgment analysis. Coca-Cola, probably a little bit more excited about getting a summary judgment than the city was, and throughout this, the course of the management of the case, Coca-Cola had indicated that it did not intend to name new parties, or when it did seek leave to amend, which it did multiple times, it didn't bring up the new contract claim. And finally, the court, in looking at this, makes the observation that maybe this was an amendment that was brought up for an improper purpose. It doesn't develop that theory very much, but basically suggests that, and I think when you read that comment on top of the timing and on top of the case management that the court was doing, I think you see that this court in no way abused its discretion in denying leave to amend. Counsel, Judge Gould, what exactly is the improper purpose that you're adverting to? Well, what was happening was that the matter was being positioned for summary judgment hearings, and there were other stays in place, application had been made to lift that stay to allow discovery to proceed between the city and BCI Coca-Cola. That was moving ahead, and basically on the eve of some of the scheduling here of the motions, the application for an amendment was made, and this was on the heels of a third amended complaint that had just been done just several months before. I think that was at the basis for the court's determination that this may have been for the purpose of delay rather than for bona fide reason. Okay. Had the discovery proceeded without the contract claim being in the case with people who could have given evidence on that contract issue? Yes. There were a number of depositions that had gone forward, approximately six, and those depositions could have addressed the contract claims and the defenses under the contract claims. Okay, thank you. Thank you. So unless there's some further questions that the court has, I would strongly recommend to this court the Commander Royal decision. I think it is a sound decision for dealing with a complicated issue in CERCLA, which has all of the issues that this panel has noted in the past in the Burlington nor than in other cases, and if there are no further questions, I'm submitting. Mr. Matfield. I'd just like to make the point again that this is not a case about corporate form. This is not a best foods analysis. This is about an entity that has a property interest in the form of a contract, and it's from there that we get into this battle of semantics about whether we call that contract a permit or a lease. In the old city charter, they did make a distinction between a lease, which they would only give to people that were on land that was not used for navigation, commerce, and fishery. Granted, these are precious state tidelands, and I think the city recognizes that it's not allowed to convey those and maybe not allowed to convey an estate inland, and for that reason we distinguish between a permit and a lease. But as Your Honor noted, even what we call a permit has all the trappings of a commercial lease. You know, if we're going to base CERCLA liability on the name, well, then the city and the Port of L.A. will never be able to stick CERCLA owner liability on a permit T just because of the semantics of it. Well, that may be so. And they may have to stick it only on an operator such as Santa Pedra Boat Works. Potentially, but, you know, again, that's to lose the owner-operator distinction. No. No, you're right. Does it serve the goal of CERCLA? Well, you know, the goal of CERCLA was to prevent the taxpayer from paying for the cleanups. Well, but that was exactly the goal of the Ninth Circuit in Burlington Northern and in Shell Oil, both of which were reversed by the Supreme Court of the United States, saying it's not enough that the taxpayer doesn't want to pay. Congress allows CERCLA to be interpreted by the common law rules, and they applied the common law rules as to apportionment from the restatement. So why shouldn't we apply the common law rules as to the nuisance case from the restatement? Well, the restatement said right to occupy. Did PAI have a right to occupy? Definitely. They're the ones that held the contract. It's not possess. It's right to possess. But hadn't PAI already entitled or put in possession of Santa Pedra Boat Works to do the work? But that's an issue that goes. I'm going to mention the quote from South Carolina Recycling. Pardon me, counsel. What was the relationship from the very beginning of PAI and Santa Pedra Boat Works as to why Santa Pedra Boat Works was able to carry on its work, which it had been doing before that? Did they have a lease between PAI and Santa Pedra Boat Works, or was there a contract? What was the basis of that possession? It might have been a sublease. It might have been an oral sublease. There's nothing in the record. Nothing in the record. Tell me what I know. But South Carolina Recycling Disposal says a lesser or sublessor who allows property under his control to be used by another in a manner which endangers third parties or creates a nuisance is, along with the lessee or sublessee, liable for the harm. The nuisance analysis and the circle analysis sort of, you know, go hand in hand. In South Carolina, that was a non-circular case? No, that was a South Carolina district court, and it was affirmed by the Fourth Circuit under a different case name. Oh. The only last thing I could mention was, you know, as to the leave to amend. I would hope it seems as odd to this court as it does to me that we can have all this discussion and all this briefing about these contracts, but yet somehow, at the same time, find prejudice in adding a claim for breach of the contract. My only point there is that. Were witnesses, counsel, were witnesses deposed who could have given testimony on the contract issues, who would have to be deposed again? They were, Your Honor. But my question would be, what further information about the contract, what is it about the potential of a breach claim that causes the prejudice? My point here is that in this context, where the contracts are already at issue, I don't think it's appropriate for the court to indulge in a presumption that there's prejudice there. Why did it take so long to amend it? I think you had four opportunities before you finally got around to it. I knew you were going to ask me that. You know, I don't know. The city had outside counsel on this. I got involved when another city attorney retired. I went to one of these depositions. I watched the paper go around, and I said, you know, here's the contract. It was in PAI's name. I said, where's the breach claim? Oh, we'll have to amend it. The way we went. Well, counsel, let's get back to the question that Judge Gould asked. The determination whether, A, the witnesses would have to be deposed again on the breach of contract action, and, B, whether that imposed a burden and therefore was prejudicial to BCI, both of those determinations seemed to me to be particularly adept for determination by the trial judge and therefore to be determinations of fact as to which abuse of discretion review should be applied. Why was the trial judge abusing his discretion here in making a determination, A, the witnesses would have to be deposed again, and, B, that would impose an undue burden on one of the parties? Because it was just a cry of prejudice. There was no supporting fact. There was no supporting allegation. Well, you say there was not sufficient evidence under our abuse of discretion standard. Correct. All right. Any more questions? No, I don't have any. Judge Gould? No, I don't. Thank you. Thank you for the extra time. All right. The case of City of Los Angeles v. BCI Coca-Cola Bottling Company of Los Angeles is submitted. Thank you, counsel, for a very interesting argument.
judges: Molloy, Gould, Bea